May it please the Court, Clay Smith, Deputy Attorney General, appearing on behalf of the appellant. I gather everybody is in agreement that the injunction is overbroad insofar as it affects the third trimester. Is that correct? Well, I think it actually is not correct in the sense that Ms. McCormack has challenged our position in that regard in her response brief. I had actually not intended to address the remedy issues in this case because I think they're adequately briefed. I intend instead, absent questions on the remedy issue, to address two issues, the core issue in the direct appeal and the core issue in the cross appeal. The briefing, of course, has been rather extensive, but there really are just two issues of substance in this case. The first is whether the district court erred in enjoining any application of Idaho Code section 18-6062 as a violative of the undue burden principles established in Casey. The second issue is whether the district court erred, and this is the cross appeal issue, in concluding that Ms. McCormack lacks standing to challenge Chapter 5 of Idaho Code Title 18. That particular chapter was adopted by the legislature and became effective on April 13, 2011. The prosecution from which the federal lawsuit arose began in May of 2011, but dealt with an alleged abortion that occurred in December of 2010. Turning to the first of those issues, the question of the propriety of Ms. McCormack's prosecution under 18-6062, let me begin by just quoting the relevant portion of that statute. It states that every woman who knowingly submits to an abortion or solicits of another for herself the production of an abortion, or who purposely terminates her own pregnancy otherwise than by a live birth, shall be deemed guilty of a felony, close quote. This statute quite plainly prohibits what I will refer to as self-abortions, that is to say abortions affected by the pregnant woman herself. It's important to understand that in support of the motion for preliminary injunction, Ms. McCormack presented virtually no facts with respect to the circumstances attendant to the abortion itself. Indeed, the court can carefully read what was before the district court for purposes of deciding the motion for TRO and then the motion for preliminary injunction and it will find no mention or discussion of or admission of the fact that Ms. McCormack had an abortion at all. The only evidence in that regard is the allegation in the criminal complaint itself that she aborted a fetus on December 24, 2010. Well, I guess that one would expect that the state would not be prosecuting her if it didn't have facts that they thought would establish a violation. Is that correct? That's correct, Your Honor. But those facts were not before the district court at the time for purposes of deciding the preliminary injunction motion. Couldn't the court take judicial notice of what was in the criminal complaint? The criminal complaint, Your Honor, was in fact before the district court, so there was no need to take judicial notice of it. It appears in – I'm sorry, Your Honor. No. It appears – it's quoted in part in paragraph 17 – excuse me – in paragraph 16 of the complaint and it is also – it also appears as an attachment to the – to an affidavit at ER 33. But going back to the factual basis or the lack thereof or, more precisely, the paucity of facts before the district court, the district court effectively held that 18-6062 could never be enforced against the woman, in essence stating that the state of Idaho lacks, by virtue of Casey, the authority to prosecute a woman in connection with an alleged abortion. Now, in support of this proposition, and there are no cases directly on point, assuming that the state legislature has, in fact, criminalized, as it has here, that conduct, the only authority that the district court cited was the 1980 district court decision in the long-lived Ashcroft – or Ashcraft – Ashcroft litigation that eventually went before the United States Supreme Court. And there, the district court declined – and, indeed, it was denied even asked by the state of Missouri – declined to construe a Missouri statute criminalizing unlawful abortions to include prosecutions against the woman herself, reasoning that such a construction would raise serious constitutional questions. The district court there, and Judge Windmill below, did not identify any authority for that proposition. And we argued before the district court that there was a long, and there is a long line of precedent, which establishes that states may enact legislation that limits the performance of abortions to physicians licensed in the state. The most recent restatement of that issue was the 1998 decision in Missouri versus Armstrong. Now, the rationale behind that longstanding rule is that states may act to further the health and safety of the woman in the abortion process itself by requiring the medical procedure to be performed by a physician. That rationale applies no less strongly to situations where a woman allegedly undertakes to perform an abortion on herself, something that is quite possible now given the availability of abortifacients that terminate at least an early stage pregnancy. So, with respect to the first core issue in this case, we believe that the district court went astray and misapplied Casey in essentially establishing a categorical rule that states cannot prosecute the pregnant woman herself for effecting an abortion. Now, the second issue is again the cross-appeal issue, which deals with Ms. McCormick's standing to challenge Chapter 5 of Title 18. That chapter is also known as the Pain-Capable Unborn Child Protection Act. As I mentioned before, that statute became effective on April 13, 2011, or approximately four months after the alleged abortion in this matter occurred and for which the prosecution was filed. There is no evidence, or there was no evidence, before the district court at the time the federal court action was filed in September of last year that Ms. McCormick was pregnant. And indeed, the entire purpose of the action was to challenge the validity of the earlier prosecution for the alleged December 2010 abortion. Ms. McCormick cites no apposite authority for the proposition that she possesses standing to challenge a statute that took effect, again, almost four months after the abortion at issue took place. Plainly enough, she could not have been unduly burdened at that point, i.e., in December of 2010, by a statute that did not exist. The speculative possibility that Ms. McCormick might become pregnant in the future was, we submit, appropriately addressed by the district court in its reliance on Roe v. Wade. As this court is aware, there were three plaintiffs, or sets of plaintiffs in that case, Ms. Roe, a childless couple, and a physician. With respect to the childless couple, they alleged standing to challenge the Texas statute because the woman in the couple would suffer, or could suffer, severe injury to herself should she become pregnant and have to go through the birthing process. The district court, but she was not pregnant at the time that the lawsuit was filed, the Supreme Court held that the possibility of a future pregnancy was too speculative for standing under Article III. Now, in this case, Ms. McCormick's claim to standing is, frankly, much more far-fetched because for her to have standing to challenge Chapter V, not only would she, one, have to become pregnant, she also would have to conclude that she desired to terminate that pregnancy through an abortion. And then she would have to make a determination to terminate that pregnancy in the latter part of the second trimester of the pregnancy itself. Chapter V, again, the Pain-Capable Unborn Child Protection Act, takes effect only at the 20th week following the last menstrual period. So, it would require a confluence of three circumstances. Given her history, it's not all that far-fetched, is it? Well, we know that she had at least two abortions. We don't know when those abortions occurred. And, again, going back to, for example, Roe v. Siegel. We do know when the last, more or less, when the last abortion took place. Those facts were not before the district court at the time it ruled on the standing issue. And, again, the standing issue was addressed in the context of a preliminary injunction, so it's really essentially a likelihood of success. But even if we assume, for purposes of argument today, that Ms. McCormick would wait until, again, the latter part of the second trimester to have an abortion, it is still, given Roe v. Wade, an entirely speculative matter and clearly insufficient to establish standing for Article III purposes. Let me just conclude by pointing to the most relevant authority on the point, which is the district court decision in the Guinness Meisner. As we discussed in our brief at pages 24 through 27, the situation there involved a claim under the Americans with Disabilities Act and a request, a demand, for a hospital to establish a birthing center that was wheelchair accessible. The district court, at the time the lawsuit was filed, the woman was not pregnant. And the district court aptly observed that in cases where plaintiffs have sought injunctive relief to prevent a harm that necessarily would befall only a pregnant individual, non-pregnancy generally has been viewed as fatal standing. We think that is the case here. Thank you. Thank you. Please, the court, Mr. Smith. I'm Rick Hearn, representing Jenny McCormick. Jenny McCormick was prosecuted criminally by the state of Idaho for the unlawful conduct of her doctors. Generally, in the Bible it states, sons should not be responsible for the sins of their fathers. But in Idaho, women seeking abortions may be held criminally liable for the conduct of their providers. Now, earlier it was asked about third trimester abortions. Let me clarify that off the top. We have not sought an injunction. We have no claims dealing with third trimester or post-violability abortions. We recognize Casey would not even apply to such abortions. The way Idaho structures its law, the requirements on performing abortions are broken down into trimesters. 608-1 deals with the first trimester, 608-2 the second, and 608-3 the third trimester. And there are no allegations before this court or in our complaint dealing with a third trimester or post-violability abortions. In Idaho, women who submit to an abortion performed by a provider whose performance of the abortion is not in compliance with the law commit a felony. That felony is what is enjoined. The felony is punishable for up to five years in prison with a minimum sentence of one year in prison for a woman to submit to an abortion if the provider's performance of that abortion does not meet the standards set out in 608-1 if it's the first trimester, 608-2 if it's the second trimester. In 608-1, the state requires the provider to have a properly staffed and equipped office, have arrangements with hospitals, and if the provider who performs the abortion does not have those, the woman who went to that provider will go to jail for up to five years. Jeannie McCormick was prosecuted under 606 for having done so. The injunction that's before this court does not deal with self-abortions. There are no facts about self-abortions, and we know that the district court did not enjoin self-abortions because the district court enjoined 606 with 608-1. And the only 608-1 sets out the standards and guidelines for doing a first trimester abortion. There is no need to have 608-1 in there if you're doing self-abortions because 608-1 doesn't deal with self-abortions. A woman under 608-2 must have the abortion performed in a hospital in that second trimester or in Idaho after the 13th week. So if a woman goes to a provider in Idaho and has the abortion in his clinic and it turns out that she was at the 14th week, the provider could go to jail, but so could the woman for up to five years for going to the provider. If the provider's license had lapsed, that's under 608-A, and the woman goes to the provider, the woman could go to jail for up to five years. That is the basis for which the district court enjoined the use of 606 in conjunction with 608-1 in this case. Finding that it is constitutionally impermissible to require the woman to police the provider and suffer criminal penalties if she does not. Now, I need to review very basically the statutes that we're dealing with. I've already said 608-1, first trimester, and it says you need to have a properly equipped office and clinic and have a relationship with the hospital. That's first trimester. When the claim was a violation of 608 and 608-1, what's it telling us? Does 608 encompass a lot more? The injunction is enjoining the state from prosecuting under 606. That says you can't prosecute women for submitting to an abortion. It could be used for self-abortions or seeking an abortion from a provider. As Mr. Smith said, it's broad. But the court explicitly held with 608-1, which means first trimester abortions, which in 608-1 says what the doctor must do to perform a first trimester abortion in Idaho. Hopefully that answers your question. So when the court enjoins 606 with 608-1, that gets rid of the possibility that the court was enjoining the criminalization of self-abortions. Because there's no 608-1 in effect with a self-abortion. 605 Title 18 puts the criminal liability on doctors. 606 puts criminal liability on women. But they both do it on the same statutory ground that if this abortion is performed not consistent with 608-1 in the first trimester, 608-2 in the second, and actually 3 in the third. So they have the same statutory scheme. A woman and a doctor can be punished for the abortion. Idaho puts submitting to an abortion level with performing an abortion. And that leads to the duty placed on women to police their providers. Now this has not come up much in Idaho or anywhere else to the best of my knowledge. Until such time as providers who are performing abortions may not be in the jurisdiction where the abortion occurs. And as Mr. Smith noted, this comes about with medical abortions, RU486. And I'm just going to use that for the shorthand. A woman can, and this was before the district court, can go on the internet, a public site says we provide medical abortions for a credit card payment, receive medication through the mail, take the medication, fill out a questionnaire to make sure it's a safe, and then take the medication and have an abortion. The state alleged that Ms. McCormick did that. Now I want to address briefly the facts that are in the record. The record was put together at a TRO hearing within a few days, and it is sparse, no doubt. Then because of abstention issues, the case was refiled, and a stipulation between Mr. Smith and myself, the state and I, that the district court would look at that TRO record and the argument to decide the preliminary injunction order. So Mr. Smith and I are jointly responsible for the sparsity of that record before the district court. The district court got that record, and while it was considering it, our motion for a preliminary injunction was filed, and also was filed a motion for class certification. And there was other evidence placed before the court, including the police report, of course, that the state has always had, containing the facts. So at the time of the preliminary injunction from this district court, the record did contain the facts that it did not contain back at the TRO hearing. And if that's a problem, the reason it didn't have it at the preliminary injunction when that motion was filed was because Mr. Smith and I stipulated that the court could decide the preliminary injunction on that basis. The court found that policing of doctors by women that have an abortion does violate Casey. It is an undue burden on women to need to check out their doctor. In fact, the court specifically held it creates a Hobson's choice. You either vet your doctor, make sure his license is updated, his office is done, or you face criminal liability, you woman, if that doctor isn't in compliance with Idaho law. A Hobson's choice. I really had to look that up. That's... Actually, a Hobson's choice. We know what it is. Okay. No choice at all. We deal with horses. Yes. Okay. It's no choice at all. From Cambridge. That's right. It's no choice at all. And Ms. McCormick had no choice at all. And the district court did find that placing that no choice at all before women in Idaho, that violates their constitutional rights because many women will say, well, I'm just not going to have an abortion then because I may go to jail five years if my doctor messed up. The court in doing so never reached the constitutionality of 608-1, 2, and we didn't plead, 3, or any of the other requirements. It didn't reach whether a state could or could not require a licensed doctor. We have no quarrel with Mr. Smith that a state can punish doctors who do any kind of medical procedure in a state without being licensed or practice in any way without being licensed in the state. We have no quarrel with that. But the court never got there. It was enough that requiring women, which Idaho nor no other state requires to the best of my knowledge in any other medical procedure to police their doctors, women seeking an abortion in Idaho to police their doctors. And I'll just read this short quote stated, a statute that punishes women for the abortion provider's actions presents a much different question than a statute that imposes penalties on the abortion provider for its own lack of compliance with certain reasonable requirements, end quote. And I believe that the court does find and did find that requiring the doctor to have a license before he practiced medicine is certainly a reasonable requirement. Moving to Chapter 5 and also 608.2, dealing with the second trimester, in our situation, we allege that some of those requirements are not reasonable. And the court applied Roe v. Wade to find that because Ms. McCormick was not pregnant, nor alleged she was, she didn't have standing to go on these substantive issues that could only be applied against her provider, such as Chapter 5. Our point, our argument is that Roe v. Wade is good law on standing, no quarrel with that, but Lyons v. City of Los Angeles holds here. And to see that, the standing analysis from Lyons, to see that, one must just contrast Ms. McCormick and Roe v. Wade. Ms. Roe was pregnant and wanted an abortion, Ms. McCormick had been pregnant and had an abortion. She didn't need another abortion. Ms. Roe couldn't get an abortion, and she wanted to challenge why she couldn't, because the prosecutor was suing the providers. There was a suit, and that's why the doctors couldn't sue themselves under abstention and perish the younger doctor. Here, it's Ms. McCormick that is being prosecuted by the state. So these cases are, while they both seek the same relief, unconstitutionality of the statute, the two cases are very different postures. There is no action against the doctor in McCormick's case. The state doesn't know who the doctor is. I don't even know who the doctor is, and probably not a doctor in Idaho. So they are very different. So in Lyons, as this panel well knows, was about a chokehold and whether the past violation of a right creates a right for perspective relief in the future. And that's what we submit is at issue here. There has been a past, at least an alleged past violation of Ms. McCormick's right. The issue then should be whether she has a right to get perspective relief. Is it too speculative that this same defendant that violated her right in the future will violate that same right again? Now, Mr. Smith is right. If you require her to get pregnant a second time and go for 20 weeks, which the police report shows that she did have her abortion in the 20th week, if you require her to become pregnant again, it's almost absurd. Those circumstances will never happen exactly like that again. But the critical point is her right is infringed even greater by the state prosecuting her providers. What good is it if she doesn't even get the chance to police her providers and have an abortion if Chapter 5 and the Chapter 8 are so onerous to her providers that when she does become pregnant again, if she does, there are no providers out there? And the state can use 608-1, the exact same statute that is enjoined when it's applied to women, to prosecute providers under 605. So it uses the same laws, applies them to providers. It can also use Chapter 5, which can only be used against providers, to dry up the availability of all her providers, which was in the record that there aren't any providers except the Internet providers in all of southeast Idaho. She has to go to another state. And if Chapter 5 were to be enforced, it would make it illegal for Ms. McCormick to have had an abortion. In the identical matter, the police report that's in the record before you shows that Ms. McCormick was alleged to have done it. If those facts recur, she could be punished under 608-2, and the provider could be punished if the provider could be found under Chapter 5. It's also important to note that we're not asking you to enjoin the enforcement of Chapter 5. We're asking you to either decide that the correct analysis for standing on a past constitutional right is Lyons v. the City of Los Angeles, or remand that back to the district court to apply Lyons and to distinguish these facts from the standing analysis of Roe. I'll be late. I will conclude if there are no further questions. Thank you for your attention. Before you leave, are you contending, as does Mr. Smith, that the injunction is too broad? Quite the contrary. The injunction we contend is not broad enough. It should also include 608-2. It does include 606, making a crime for women, if the abortion doesn't comply with 608-1. But that burden of 608-1 is no less than the burden on a woman to police her provider in a second trimester abortion under 608-2. There's no difference in the burden. It may even be harder. Our facts were 608-2, and I don't believe either Mr. Smith nor I know why the court elected to enjoin one of those two statutes in conjunction with 608-1 rather than 608-2. I don't know. But as we've briefed, the burden on a woman to police in a first trimester is no different than the burden on a woman for a second trimester. And if the court was interested in the facts of this case, this case was a second trimester abortion. So it is not overbroad. It is too narrow, and it does not reach self-abortions because it does have 608 or third trimester. Am I understanding you to say when the court below ruled that she lacked standing on Chapter 5, essentially what that does is say, well, you say it doesn't apply to me, but what it has done is effectively removed the possibility that I can go to any clinic and have it done. Correct. So she would have standing simply because she's injured by it. That's what I would like to have this resolved, is that she could. These things become much more important with the advent of RU-46, which is FDA-approved drug. It's been out for 10 years. It's legal to be distributed in Idaho because in a second trimester abortion, medical abortion using RU-486, she will violate, the woman who takes it, 608-2, and the provider will violate 608-2 and Chapter 5 if it's after the 19th week. Anything else? All right. Thank you. Thank you. I'll try to be as brief as possible because arguments this morning have gone on quite long. With respect to the first issue, I understand counsel to suggest that if self-abortion is involved, that the woman could be prosecuted because there would be no violation. She would have no duty to have policed her physician because, in essence, the physician would not exist in the case. I think what that suggests is the need in this kind of situation, which is quite extraordinary, for the district court to exercise discretion not to issue an injunction that effectively declares a statute or enjoins a statute from any application, when, in fact, it can be applied in some situations perfectly lawfully. And I appreciate and understand the special standing rules that apply in the abortion context by virtue of the joint opinion in Casey. But in this situation, I think it's hard to see that 606 would be facially unconstitutional. With respect to the stipulation, what the stipulation stated, and it appears at page 34 of the — excuse me, at page 133, I believe, of the ER, that the parties asked the court to decide the case on essentially the same pleadings. That had been before the court in the first lawsuit. And the district court eventually issued essentially the same decision in the second case that it had issued in the first case. The only difference, of course, between the two cases was the absence of the younger issue. Turning to the standing issue, I'm a little confused by plaintiffs, by Ms. McCormick's position, but the evidence shows that there were no providers in Bannock County for abortion. There is no evidence to suggest that the reason that there are no providers is because of the requirements in Chapter 6, or now Chapter 5. It's also undisputed that this was an extraordinary case. The county attorney, Mark Heidemann, the appellant, has been the prosecuting attorney since 1991. This is the first time that he has prosecuted anyone, provider or woman, the pregnant woman, under the Idaho abortion statutes. So the suggestion that the existence of these statutes is in some fashion frustrated, the availability of abortions thereby giving Ms. McCormick this kind of freestanding ability to challenge statutes that weren't even in effect when she was pregnant is quite extraordinary. Thank you. Well, why do you think he, Mr. Heidemann, went after McCormick? Well, presumably, Your Honor, and there's no evidence, there's no facts relating to his motivation, presumably because he concluded, based on the investigation conducted by the Pocatello Police Department, that there was an appropriate basis for doing so. Well, there's no political basis for doing so. Your Honor, again, I can't speak to his subjective motivation. All I can speak to is the fact that the criminal complaint was filed after a rather thorough investigation. So for over 20 years, there was no prosecution in this area. And then one was instituted. That's correct, Your Honor. Of course, there are lots of facts here that some may not find very sympathetic. Well, again, I don't mean to parse this too closely, but we're dealing now with the facts before the district court. Oh, I know all that. I understand that, Your Honor. Yeah, but, okay, thanks. Thank you, Your Honor. And we just decide these things on the law before us. Once you made that statement, I just got curious. Curious, Your Honor, curious, Your Honor. Okay. Thanks. This matter is submitted, and the Court will adjourn tomorrow morning at 9 o'clock. And they will resume its work tomorrow morning at 9 o'clock.
judges: Walter, Fletcher, Pregerson